# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| JEFFERY THURLOW, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Docket No. 2:16-cv-179-NT ) |
| YORK HOSPITAL, | ) ) |
| Defendant. | ) ) |

## ORDER ON PLAINTIFF'S MOTION TO AMEND AND DEFENDANT'S MOTION TO DISMISS

Before me are the Plaintiff's motion to amend the Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2) (ECF No. 33) and the Defendant's motion to dismiss pursuant to Rule 12(b)(6) (ECF No. 27). For the reasons stated below, the Plaintiff's motion is **GRANTED** and the Defendant's motion is **DENIED**.

## BACKGROUND[1]

The Plaintiff is Doctor Jeffery Thurlow, a board-certified surgeon who specializes in general surgery. Proposed Am. Compl. ¶¶ 2, 7 ("**PAC**") (ECF No. 33-1). Dr. Thurlow has held clinical privileges at York Hospital since 2002. *See* PAC ¶¶ 13-14. York Hospital recruited him in order to "strengthen the clinical expertise and the capacity of York Hospital's Department of Surgery." PAC ¶ 13. In 2006, York Hospital hired Dr. Thurlow as an employee. PAC ¶ 14. During his tenure at York Hospital, Dr.

---

[1] I glean the following facts from the Plaintiff's Proposed Amended Complaint, taking all well-pleaded facts as true and drawing all reasonable inferences in the Plaintiff's favor. *In re Citigroup, Inc.*, 535 F.3d 45, 52 (1st Cir. 2008).

Thurlow was "by far the most productive general surgeon in its employ" and "was universally regarded by his peers as the most dependable, skilled, and proficient general surgeon on the York Hospital staff." PAC ¶ 44.

The Defendant is York Hospital, located in York, Maine. PAC ¶ 8. Jud Knox is the President of York Hospital. PAC ¶ 17. Although Knox is at the helm of the hospital administration, the York Hospital Medical Staff, an association of physicians, functions largely independently of the hospital administration. *See* PAC ¶ 32. Dr. Thurlow was the President of the Medical Staff from approximately 2010 to 2012. *See* PAC ¶¶ 21, 26.

In 2007, York Hospital hired "Dr. Doe" to join the practice that included Dr. Thurlow. PAC ¶ 15. While working with Dr. Doe, Dr. Thurlow became aware of "evidence which caused him to believe that Dr. Doe was performing unnecessary peripheral nerve surgery, endangering patients in the process, falsifying surgical notes, and 'coding' fraudulently for the surgical procedures he performed in order to support claims for reimbursement to which he was not legally entitled." PAC ¶ 16. Dr. Thurlow informed Knox about his concerns. PAC ¶ 17. Eventually, Dr. Doe was removed from Dr. Thurlow's practice group at the insistence of Dr. Thurlow and another physician. PAC ¶ 19. Dr. Doe was still "retained as an employee of York Hospital as a member of a second hospital-owned general surgery practice," but Dr. Thurlow did not have to work with him because there was no cross-coverage arrangement between the two separate hospital-owned surgery groups. *See* PAC ¶¶ 19-20.

In 2010, while Dr. Thurlow was the President of the Medical Staff, he began a formal investigation into Dr. Doe's peripheral nerve surgery practice. PAC ¶ 21. The resulting external review of Dr. Doe's practice "was highly critical." PAC ¶ 24. The Medical Executive Committee of the York Hospital Medical Staff held a special meeting with the author of the external review. *See* PAC ¶ 24. The meeting resulted in "a unanimous vote to suspend Dr. Doe's privileges to perform peripheral nerve surgery." PAC ¶ 24.

In April of 2012, Dr. Doe tried to "regain permission to perform peripheral nerve procedures." PAC ¶ 25. In response to this effort, Dr. Thurlow "made a presentation to hospital leadership wherein he set forth . . . his concerns about several aspects of Dr. Doe's practice, including what he believed to be Dr. Doe's fraudulent billing of the United States and other payers." PAC ¶ 25. In the summer of 2012, Dr. Thurlow's tenure of President of the Medical Staff ended. PAC ¶ 26. Soon after, Dr. Doe's privileges to perform peripheral nerve surgery were reinstated. PAC ¶ 27.

Although no longer in a leadership position, Dr. Thurlow "continued to express his ongoing concerns about patient safety and ethical issues" to the York Hospital administration. PAC ¶ 28. He continued to voice his concerns through at least the end of 2012. PAC ¶ 30. But the York Hospital administration never placed restrictions on Dr. Doe's practice. *See* PAC ¶ 32. Instead, "[t]he only restrictions that were ever imposed on Dr. Doe's practice were imposed by the York Hospital Medical Staff" and they were "imposed without the support of Jud Knox." PAC ¶ 32. The

3

restrictions placed on Dr. Doe by the Medical Staff, which Knox had resisted, were "economically costly to York Hospital." PAC ¶ 33.

"At some point before January 2013," Knox initiated a plan to merge the two separate hospital-owned surgery groups. PAC ¶ 34. Knox knew that Dr. Thurlow thought that Dr. Doe was "dangerous, dishonest, and unscrupulous" and that the merger would have required the two doctors to work alongside one another. PAC ¶¶ 35, 37. Dr. Thurlow alleges that the plan to merge the two groups was developed in part to create working conditions that were intolerable for him. PAC ¶ 39. He was informed of the planned merger in an email on January 28, 2013. PAC ¶ 34.

Dr. Thurlow refused to work with Dr. Doe. PAC ¶ 41. York Hospital fired Dr. Thurlow without cause and without notice on March 27, 2013.[2] PAC ¶ 42. The hospital continues to employ Dr. Doe and pays him "substantially more than the fair value of the services he performs." PAC ¶ 46. After terminating Dr. Thurlow, York Hospital denied him access to a list of his patients and sent a letter to one of his former patients implying that "Dr. Thurlow had voluntarily abandoned the patient." PAC ¶ 50.

Because the York Hospital Medical Staff functions largely independently of the hospital administration, Dr. Thurlow continued to remain a member of the Medical Staff even though he was no longer a York Hospital employee. *See* PAC ¶¶ 32, 51. On

---

[2] The Defendant contends that the terms of Dr. Thurlow's employment contract permitted York Hospital to terminate him without cause, provided certain conditions were met. Def.'s Mot. to Dismiss 4 (ECF No. 27). Assuming *arguendo* that I could properly consider the employment contract at this stage, the Defendant has nonetheless failed to provide me with the actual document. In any event, Dr. Thurlow is not claiming that York Hospital breached the terms of his employment contract, only that it retaliated against him in violation of the FCA.

December 17, 2013, Knox gave Dr. Thurlow a "behavioral compact" that Dr. Thurlow "would be required to sign if he wished to engage Knox in discussions around 'the constructive development of cohesive and collaborative general surgical services at York Hospital.'" PAC ¶ 51. The behavioral compact stated, among other things, that Dr. Thurlow was expected to: (1) "[s]upport the Hospital organization, the Board of Trustees, Jud Knox and the Leadership of the Organization;" (2) refrain from "speaking negatively about the Organization, the Board of Trustees or Leadership;" (3) "cease speaking negatively about past decisions that have been made by the Hospital Organization and Leadership;" and (4) "[d]irect [his] concerns, criticisms, and disagreements with the Hospital decisions and policies directly to Jud Knox in one-on-one private conversations." Ex. A to PAC ("**Behavioral Compact**") (ECF No. 34).

## PROCEDURAL HISTORY

On March 25, 2016, Dr. Thurlow filed a one-count Complaint alleging retaliation in violation of the False Claims Act (the "**FCA**"), 31 U.S.C. §§ 3729–3733. Although Dr. Thurlow's attorney emailed a copy of the Complaint and Summons to the Defendant's attorney, he did not serve the Summons and Complaint immediately because he "had filed the complaint more hurriedly than [he] would have liked, in order to avoid a time bar, and [he] intended to continue [his] investigation before making service." Taintor Aff. ¶ 9 (ECF No. 11-1). The Plaintiff then failed to timely serve the Complaint.

5

The Clerk of Court issued an Order to Show Cause asking the Plaintiff to explain why he failed to timely serve the Defendant on June 27, 2016. (ECF No. 7). In response, the Plaintiff's attorney served the Defendant with an Amended Summons on June 30, 2016. Taintor Aff. ¶ 12. The Clerk of Court then issued a second Order to Show Cause directing the Plaintiff to explain why service was not timely made. (ECF No. 10). On July 7, 2016, the Plaintiff timely responded to the Orders to Show Cause, stating that he mistakenly believed that he had 120 days to serve the Complaint, rather than the 90 days allowed by the Federal Rules of Civil Procedure. Taintor Aff. ¶ 10. I found the Plaintiff had shown good cause and terminated the Orders to Show Cause. (ECF No. 12). The Defendant then moved to vacate my order finding good cause. Mot. to Vacate (ECF No. 17). Upon reconsideration, I granted the Defendant's motion, finding that the Plaintiff had failed to satisfy the good cause standard under Federal Rule of Civil Procedure 4(m). Order on Mot. to Vacate 3 (ECF No. 24). Nevertheless, I exercised my discretion and permitted late service of the Complaint. Order on Mot. to Vacate 3-5.

The Defendant subsequently moved to dismiss the Complaint for failure to state a claim on August 31, 2016. Def.'s Mot. to Dismiss (ECF No. 27). On September 21, 2016, the Plaintiff filed an opposition to the Defendant's motion to dismiss and also filed a motion for leave to amend the Complaint. Pl.'s Mot. to Amend Compl. (ECF No. 33). The PAC contains more detailed factual allegations regarding the Plaintiff's FCA claim (Count I) and adds two state law claims for intentional

interference with contractual relations and prospective economic advantage (Count II) and for wrongful use of judicial proceedings (Count III).

**LEGAL STANDARD**

A plaintiff seeking to amend more than "21 days after service of a responsive pleading" must obtain the written consent of the opposing party or leave of court.[3] Fed. R. Civ. P. 15(a)(1)(B)-(a)(2). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "[t]he liberal amendment policy prescribed by Rule 15(a) does not mean that leave will be granted in all cases." 6 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1487 (3d ed.) Leave to amend may be denied when "the request is characterized by 'undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part.'" *Calderón-Serra v. Wilmington Trust Co.*, 715 F.3d 14, 19 (1st Cir. 2013) (quoting *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006)).

"'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996). "In assessing futility, the district court must apply the standard

---

[3] In this case, the Plaintiff was unable to amend his Complaint as a matter of course in response to the Defendant's motion to dismiss because of a procedural maneuver by the Defendant. The Defendant filed an Answer on August 10, 2016 and then moved to dismiss exactly 21 days later on August 31. It was technically improper for the Defendant to first file an Answer and then move to dismiss under Federal Rule of Civil Procedure 12(b)(6). Normally, a motion under 12(b) "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b); *see also* 5C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 1361 (3d ed.) ("If the defendant decides to assert a Rule 12(b) defense by motion, then he must do so before filing the answer."). Courts, however, have not interpreted this timing provision strictly and "have allowed untimely motions if the defense has been previously included in the answer," as it was here. Wright & Miller, *supra*, § 1361; *see also* Answer 4 (ECF No. 25).

7

which applies to motions to dismiss under Fed. R. Civ. P. 12(b)(6)." *Morgan v. Town of Lexington*, 823 F.3d 737, 742 (1st Cir. 2016) (citation omitted). Under Rule 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." A court should grant a Rule 12(b)(6) motion if the complaint fails the limited notice pleading standard imposed by Rule 8(a)(2). This "requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). The plausibility inquiry has two steps:

> First, the court must sift through the averments in the complaint, separating conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited). Second, the court must consider whether the winnowed residue of factual allegations gives rise to a plausible claim to relief.

*Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citation omitted). In assessing plausibility, the reviewing court must read the complaint as a whole and "draw on its judicial experience and common sense." *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Moreover, at the pleading stage, a plaintiff does not have to "plead facts sufficient to establish a prima facie case*.*" *Rodríguez–Reyes*, 711 F.3d at 54. That is because the "prima facie standard is an evidentiary standard, not a pleading standard, and there is no need to set forth a detailed evidentiary proffer in a complaint." *Id*. Nevertheless, "the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim." *Id.*

8

## DISCUSSION

The Defendant contends that leave to amend should be denied because of (1) the Plaintiff's lack of due diligence and (2) the futility of the proposed amendments. Def.'s Omnibus Reply to Pl.'s Opp'n to Mot. to Dismiss and Pl.'s Mot. for Leave to Amend 5 ("**Def.'s Reply**") (ECF No. 37). I address each argument in turn.

### I. Lack of Due Diligence

The Defendant's due diligence argument is threefold. First, the Defendant contends that the Plaintiff's initial failure to timely serve the Complaint evinces a lack of due diligence. Def.'s Reply 6. The Defendant offers no authority in support of this argument. The failure to timely serve the Complaint (by seven days) is an issue that I have already dealt with and does not warrant denial of leave to amend at this early stage.

Second, the Defendant points out that the Plaintiff's new factual allegations and state law claims are based on "information that plaintiff possessed at the time of originally filing the Complaint" and argues that "[c]ourts are more resistant to amendments when the proposed allegations were known or knowable at the time the original pleading was filed." Def.'s Reply 6 (citing cases). The procedural posture of the cases cited by the Defendant in support of its due diligence argument are inapposite. In *Gray v. St. Martin's Press, Inc.*, the First Circuit upheld the district court's denial of leave to amend where the Plaintiff sought to amend three years after the complaint was filed, discovery had closed, and the court had already ruled on a motion for partial summary judgment. 221 F.3d 243, 247, 253 (1st Cir. 2000). The Defendant's reliance on *Quaker State Oil Refining Corp. v. Garrity Oil Co.* is similarly

misplaced. *See* 884 F.2d 1510, 1517 (1st Cir. 1989). There, the defendant sought to add a permissive counterclaim two years after the complaint was filed. The First Circuit held that the district court acted within its discretion in denying leave to amend because "a great deal of discovery had taken place without reference" to the new theory, thus prejudicing the plaintiff, and the defendant "never proffered a satisfactory explanation for its delay." *Id.* at 1518.

The facts of this case are a far cry from *Gray* and *Quaker*. The Plaintiff is seeking amendment for the first time "in order to address any perceived deficiencies in his original Complaint." Pl.'s Mot. to Amend Compl. 2. At the time he moved to amend, the motion to dismiss had not been fully briefed. Initial disclosures and discovery requests had not been served by the parties. Pl.'s Mot. to Amend Compl. 3. And the pretrial deadlines in the scheduling order have been stayed. *See* Order on Mot. to Stay (ECF No. 36). Furthermore, the Defendant has not explained how it would be prejudiced by allowing amendment.

The Defendant's third argument is that the Court should consider the Plaintiff's intent in waiting to request leave to amend until after the Defendant moved to dismiss. Def.'s Reply 7 (citing *United States ex rel. D'Agostino v. EV3, Inc.*, 802 F.3d 188, 195 (1st Cir. 2015)). The Plaintiff's "blatant attempt to unnecessarily extend this lawsuit and drain the Defendant and this Court of valuable resources," the Defendant says, should not be rewarded. Def.'s Reply 7. In *D'Agostino*, the First Circuit reversed the district court, which had applied the wrong legal standard in denying the plaintiff's *fourth* motion to amend. 802 F.3d at 195. The First Circuit

10

noted that if the district court concluded that the plaintiff "was attempting to torpedo [the court's] briefing schedule, that conclusion could be a proper factor in its Rule 15(a)(2) calculus." *Id.*

I do not consider the Plaintiff's *first* motion to amend to be an attempt to torpedo this Court's briefing schedule. Nor do I agree with the Defendant's characterization of this motion as a "blatant attempt to unnecessarily extend this lawsuit and drain the Defendant and this Court of valuable resources."[4] Def.'s Reply 7. The Defendant's real gripe appears to be that the Plaintiff has "moot[ed] the effectiveness of [its] 12(b) motion" by "peeking at Defendant's hand and reshuffling the deck when the opportunity presented itself." Def.'s Reply 7 n.9. But contrary to the Defendant's position, moving to amend in response to a motion to dismiss is not improper. *See* Fed. R. Civ. P. 15 advisory comm. note, 2009 Amendment (stating that the rule "will force the pleader to consider carefully and promptly the wisdom of amending to meet the arguments in the motion" and that "a [r]esponsive amendment may avoid the need to decide the motion").

---

[4] After the briefing on the Plaintiff's motion to amend had closed, the Defendant filed a motion for leave to file a sur-reply in order to bring "two important points to the Court's awareness." Def.'s Mot. for Leave to File Sur-Reply 1 (ECF No. 40). "Neither the Federal Rules nor the Local Rules permits a party to file a surreply to the moving party's reply." *Aero Union Corp. v. Aircraft Deconstructors Int'l LLC*, No. 1:11-484-JAW, 2012 WL 3679627, at *9 (D. Me. Aug. 24, 2012). Thus, sur-replies are disfavored and granted only in rare circumstances. *In re Light Cigarettes Mktg. Sales Practices Litig.*, 832 F. Supp. 2d 74, 78 (D. Me. 2011). I have reviewed the Defendant's proposed sur-reply and find that the points made therein do not warrant granting of the motion. The Defendant's motion is **DENIED**.

## II. Futility of the FCA Retaliation Claim

The Defendant further contends that leave to amend should be denied because the Plaintiff's FCA claim is futile.[5] Def.'s Reply 8. The FCA makes it unlawful for an employer to take adverse employment action against an employee because of the employee's efforts to prevent the employer from defrauding the federal government. 31 U.S.C. § 3730(h). To ultimately prevail on a claim for retaliation under the FCA, an employee must show that "(i) he was engaged in conduct protected under the FCA; (ii) the employer had knowledge of this conduct; and (iii) the employer retaliated against the employee because of this conduct." *Harrington v. Aggregate Indus.-Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012).[6]

The Defendant's futility argument focuses on the third element, causation, and contends that the PAC does not "evince a plausible connection between [Dr. Thurlow's] protected activity and the adverse employment action." Def.'s Reply 8. The Defendant maintains that the PAC is devoid of any non-conclusory facts suggesting that it retaliated in terminating Dr. Thurlow's employment, and that the time lapse

---

[5] I have considered the arguments raised in the Defendant's motion to dismiss in assessing the proposed Amended Complaint.

[6] In 2012, I explained that "[t]he FCA does not require a plaintiff be terminated solely because he engaged in protected activity. Rather, the employer need only be 'motivated, at least in part by the employee's engaging in protected activity.'" *Manfield v. Alutiiq Int'l Sols., Inc.*, 851 F. Supp. 2d 196, 204 (D. Me. 2012) (quoting *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 240 (1st Cir. 2004)). But today, the standard for causation under the FCA is unclear given the Supreme Court's decision that Title VII's retaliation provision requires but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013). The First Circuit recently assumed without deciding that but-for causation applies to the FCA. *United States ex rel. Hamrick v. GlaxoSmithKline LLC*, 814 F.3d 10, 18 (1st Cir. 2016). I do not dwell on this issue here because I find that the Plaintiff's claim is plausible under the more demanding but-for standard.

12

between the Plaintiff's protected activity and his termination is too great to support an inference of causation.[7] Def.'s Reply 8-9.

At this early stage, the Defendant's temporal proximity argument is foreclosed by First Circuit precedent. "[T]emporal proximity is merely one factor relevant to causation and usually only later in the proceedings, for example at summary judgment." *Garayalde-Rijos v. Municipality of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014) (quotations omitted). In *Garayalde-Rijos,* the First Circuit noted that a gap of five months is a "far cry" from "a temporal gap so attenuated as not to meet the plausibility standard for surviving motions to dismiss." *Id*. (reversing dismissal of a Title VII retaliation claim where district court found the plaintiff's "pleadings inadequate due to its view that alleged causation for retaliation must be deemed implausible based solely on a five-month period between the protected conduct and adverse employment action"). In this case, the Plaintiff continued to oppose the restoration of Dr. Doe's privileges through at least the end of 2012, and he was terminated on March 27, 2013. PAC ¶¶ 30, 42. At this stage, this three month gap supports a plausible inference of retaliation.[8] *See Garayalde-Rijos,* 747 F.3d at 25; *see also Gascard v. Franklin Pierce Univ.*, No. 14-CV-220-JL, 2015 WL 1097485, at *5 (D.N.H. Mar. 11, 2015) (four month gap sufficient to state a plausible Title VII retaliation claim).

---

7     Given the futility of the anchoring federal claim, the Defendant argues that I should decline to exercise supplemental jurisdiction over the Plaintiff's two state law claims. Def.'s Reply 8.

8     Given this conclusion, I do not address the Plaintiff's argument that the relevant date for temporal proximity "is the date the employer formulated or put into motion a plan to retaliate, not the date the plan had its effect on the plaintiff." Pl.'s Opp'n to Def.'s Mot. to Dismiss 12 (ECF No. 32).

In addition, the PAC does not merely rely on temporal proximity. Read as a whole, the PAC states a plausible claim for retaliation under the FCA. Dr. Thurlow alleges that "he was by far the most productive general surgeon" employed by York Hospital and that "he was universally regarded by his peers as the most dependable, skilled, and proficient general surgeon on the York Hospital staff." PAC ¶ 44. Nevertheless, he was terminated "without cause and without notice." PAC ¶ 42. His termination came on the heels of a lengthy battle concerning Dr. Doe's peripheral nerve surgery practice. Although Dr. Thurlow was successful in curtailing Dr. Doe's practice while he was the President of the Medical Staff, the restrictions placed on Dr. Doe's practice, which hurt York Hospital financially, were never supported by Knox or the York Hospital administration. PAC ¶¶ 21-25, 32-33.

Soon after Dr. Thurlow's tenure as President ended, Dr. Doe's privileges to perform the challenged nerve surgery were reinstated. PAC ¶ 27. Dr. Thurlow continued to voice his opposition to Dr. Doe's practice through the end of 2012 even though he was no longer in a leadership position. PAC ¶ 28. Meanwhile, Knox devised a plan in January of 2013 to merge the two hospital-owned general surgery groups, which would have forced Dr. Thurlow and Dr. Doe to "work closely with one another, 'covering' one another's patients." PAC ¶ 35. Knox knew that Dr. Thurlow regarded Dr. Doe as "dangerous, dishonest, and unscrupulous," and that the merger would be intolerable to Dr. Thurlow. PAC ¶¶ 37, 39. After Dr. Thurlow refused to work with Dr. Doe, he was terminated. PAC ¶¶ 41-42. The cumulative weight of these

allegations, taken as true and drawing all reasonable inferences in Plaintiff's favor, plausibly allege that Dr. Thurlow was terminated because of his protected activity.

The behavioral compact lends further support to the Plaintiff's claim. The compact, which was signed approximately nine months after Dr. Thurlow was terminated as a hospital employee, stated that York Hospital expected him to: (1) "[s]upport the Hospital organization, the Board of Trustees, Jud Knox and the Leadership of the Organization;" (2) refrain from "speaking negatively about the Organization, the Board of Trustees or Leadership;" (3) "cease speaking negatively about past decisions that have been made by the Hospital Organization and Leadership;" and (4) "[d]irect [his] concerns, criticisms, and disagreements with the Hospital decisions and policies directly to Jud Knox in one-on-one private conversations." Behavioral Compact. Viewed in the light most favorable to the Plaintiff, the behavioral compact suggests that York Hospital was tired of Dr. Thurlow's complaints and wanted to prevent the kind of behavior by Dr. Thurlow "that led to the exposure and curtailment of Dr. Doe's fraud." Pl.'s Opp'n to Def.'s Mot. to Dismiss 19 ("**Pl.'s Opp'n**") (ECF No. 32). This, in turn, supports a plausible inference that the Defendant harbored a retaliatory animus at the time Dr. Thurlow was terminated.

The Defendant contends that the behavioral compact does not support "a plausible inference that retaliatory animus existed," and points out that the cases cited by the Plaintiff "for the proposition that comments by an employer can intimate a retaliatory mindset" do not "feature circumstantial evidence from months after the

15

alleged act of retaliation." Def.'s Reply 11. Although the behavioral compact was signed after Dr. Thurlow's termination, courts have considered post-termination comments as evidence of a retaliatory mindset. *See, e.g., Bhatia v. 7-Eleven Southland, Corp.*, No. 2:08-987-CW, 2011 WL 4499274, at \*2 (D. Utah Sept. 27, 2011) (comments made months after employee was fired "could be demonstrative of a retaliatory mindset that also existed at the time of termination").

Accordingly, I find that the Defendant's arguments do not provide an adequate basis to deny amendment or dismiss for failure to state a claim. In light of the liberal amendment policy underling Rule 15, the totality of the circumstances weigh in favor of amendment. Under the liberal pleading standards of Rule 8, I find that the Defendant's motion to dismiss should be denied.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiff's motion for leave to file an Amended Complaint (ECF No. 33) and **DENIES** the Defendant's motion to dismiss (ECF No. 27). The Plaintiff shall file the Amended Complaint on the docket within seven days of the issuance of this Order.

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 10th day of January, 2017.